## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DEMETRIUS D. BRAILEY** | **CIVIL ACTION NO.** _____ |
| **VERSUS** | **JUDGE** _____ |
| **ADDICTION RECOVERY RESOURCES, INC.** | |
| | **MAGISTRATE** _____ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### COMPLAINT WITH JURY DEMAND

**NOW INTO COURT**, through undersigned counsel, comes **DEMETRIUS D. BRAILEY** (hereinafter, "Plaintiff"), an individual of the age of majority, domiciled in the State of Louisiana, Parish of St. Tammany, who respectfully represents as follows:

1.

This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331, for the reason that this action arises under the laws of the United States, and specifically, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq*. Further, this Court has supplemental jurisdiction over the claims arising under the laws of the State of Louisiana, pursuant to 28 U.S.C. §1367(A), for the reason that the state claims, and specifically, the Louisiana Whistleblower Statute, LSA-R.S. 23:967, *et seq.*, and the Louisiana Employment Discrimination Law, LSA- R.S. 23-301, et seq. (Race Discrimination), and Breach of Contract, La. C.C. Art. 1998, arise out of the same incidents giving rise to Plaintiff's federal claims and form a part of the same case or controversy.

1

2.

Made Defendant herein is Addiction Recovery Resources, Inc. (hereinafter sometimes referred to as "ARR"), a corporation domiciled and with its principal place of business in Jefferson Parish, Louisiana.

3.

Plaintiff, an African-American female, was hired by ARR on August 4, 2015, as a Clinical Laboratory Scientist Technician licensed by the Louisiana State Board of Medical Examiners, to work at its downtown New Orleans office.

4.

Plaintiff's direct supervisor was Sharon Normand. Ms. Normand is Caucasian.

### *The Racially Hostile Work Environment At Addiction Recovery Resources*

5.

Throughout Plaintiff's employment at ARR, she was required to work in a racially hostile work environment that was created by Sharon Normand, her direct supervisor. Ms. Normand engaged in a persistent, pervasive, offensive, unwelcomed, and illegal course of conduct directed to and/or in the presence of Plaintiff, by making racial slurs, racist remarks, and through derogatory stereotyping, all of which slurs, remarks and stereotyping concerned African Americans.

6.

Ms. Normand's racially offensive, discriminatory, and hostile conduct included the following illustrative, non-exclusive acts and statements:

a. In October, 2015, Ms. Normand attended an ARR company sponsored Halloween party, at which Plaintiff was present, dressed as an African-American in an offensive and degrading manner with sagging pants, her boxers exposed, gold teeth and a large gold chain around her neck while doing prison poses and making comments such as "what up dog?" and "you know you a down ass chick", the first of many unrelenting and continual racist acts on her part which created a racially hostile work environment which Plaintiff was subjected to for over the next 13 months.

b. In January, 2016, Ms. Normand's racist comments and denigrations continued when she stated to Plaintiff, "You know, my sons have hung out with some black friends growing up and I think maybe that's played a major part in how they turned out." This was a reference to the fact that Ms. Normand's sons had drug problems.

c. In March, 2016, Ms. Normand's never-ending degradation of Plaintiff continued when she stated to Plaintiff, "Am I supposed to give you special treatment because of the color of your skin?"

d. In April, 2016, Ms. Normand told Plaintiff "I swear you my nigga."

e. In May, 2016, Ms. Normand told Plaintiff "You know what's up my nigga."

f. In June, 2016, while Plaintiff was on maternity leave, Ms. Normand told Plaintiff "Blacks have kids all the time it shouldn't take you that long to recover."

g. In July, 2016, Ms. Normand told Plaintiff, "Girl, if you wouldn't have agreed to come back when I asked I was really going to find a permanent replacement for you."

7.

In addition to the specific conduct and statements described hereinabove, Sharon Normand repeatedly referred to Plaintiff as "girl"; told Plaintiff that she "should know [her] place"; and made numerous other racial slurs and racist remarks such as "my nigger you know what's up" and "you come from a race place, but we trust you."

8.

The slurs, remarks, comments and conduct described hereinabove created a racially hostile work environment. However, despite Plaintiff's multiple complaints to Defendant concerning Ms. Normand, the hostile work environment was permitted to flourish, and Defendant failed to take any appropriate remedial action to provide Plaintiff with a work environment free of racial harassment.

### *Defendant's Breach of Contract and Interference with Plaintiff's Maternity Leave*

9.

In March, 2016, Plaintiff submitted her request for maternity leave, in contemplation of the birth of her child in May, 2016. Ms. Normand informed her it was too early to submit her request. Thereafter, in April, 2016, Plaintiff re-submitted her request for maternity leave, and informed Ms. Normand that she would be delivering by cesarean delivery on or about May 19, 2016.

10.

In direct contravention with ARR's policy regarding Maternity Leave, which entitles employees four months of leave, related to pregnancy, childbirth or related medical conditions, Ms. Normand text messaged Plaintiff multiple times while Plaintiff was on maternity leave, as

4

early as mid-June, stating that Plaintiff needed to come back to work by July 1, 2016, rather than her scheduled return date of July 11, 2017. Plaintiff informed Ms. Normand that she did not have her physician's approval to return to work, and needed to wait for her six week follow-up exam with her physician, and desired this time to further bond with her newborn infant child. She further reported to Ms. Normand that she was still experiencing physical discomfort, including soreness and spotting, in addition to suffering from emotional distress at the thought of being separated from her newborn child.

11.

With unconscionable disregard for the Plaintiff's physical and emotional condition, Ms. Normand made comments that "I will have to look for a more permanent replacement if we can't depend on you when things get rough," and that Plaintiff "needed to get [her] ass up and get back to work because the lab tech that was temporarily filling in was horrible and they were at least three weeks behind on the lab's work."

12.

Concerned that her job was in jeopardy, on or about June 27, 2016, Plaintiff returned to work against her physician's recommendations. Plaintiff believed that if she did not abide by Ms. Normand's unreasonable demands to return to work she would not have a position to which to return.

13.

Within days of returning to work, Plaintiff began experiencing vaginal hemorrhaging due to heavy lifting and repetitive movements required to perform her job, including having to dispose of multiple forty pound bags of urine. Additionally, Plaintiff was suffering from physical discomfort, emotional distress, and anxiety. Plaintiff was required to take medications to slow her

5

extensive hemorrhaging and was told by her physician that if the hemorrhaging did not cease, she would need emergency surgery and possibly a hysterectomy, causing Plaintiff extensive emotional distress in addition to her suffering related to being prematurely separated from her newborn child.

14.

Ms. Normand's actions constituted an intentional interference with Plaintiff's maternity leave, in violation of the policies of ARR and in breach of the terms of Plaintiff's employment with Defendant.

### *Defendant's Violation of the Louisiana Whistleblower Statute*

15.

On the morning of November 15, 2016, Plaintiff was instructed to shred several patients' drug test confirmation results. Upon inspection, Plaintiff identified that all of the patients' results were positive for unexpected drugs. Moments later, Ms. Normand summoned Plaintiff to her office. Plaintiff explained that the patients whose positive test results Ms. Normand ordered be destroyed were court-ordered to report to ARR for treatment as part of their probation and that the patients' physicians had not had the opportunity to review the positive test results prior to them being destroyed. Plaintiff opposed Ms. Normand's instruction to violate Louisiana law. Ms. Normand stated to plaintiff "the problem that I have with you girl is that you don't listen when I asked you to do something." Plaintiff advised Ms. Normand that Ms. Normand's demands that she destroy the positive test results violated Louisiana Law, and the terms of the court ordered probation of the subjects of the tests.

16.

Shortly after refusing to destroy the positive test results, Plaintiff was subjected to abusive, unprofessional, and racially insensitive behavior and verbally assaulted by Ms. Normand. On

November 15, 2016, Ms. Normand told Plaintiff "girl you should know your place." Ms. Normand stood directly over Plaintiff while she was working and began making racially offensive comments to Plaintiff, including "you are the only black girl that works at this location and I decided to hire you because you know the lab but you overstepped your boundaries." The verbal abuse and threats continued for over fifteen to twenty minutes, and caused Plaintiff extreme emotional distress, to the point she was sobbing. Plaintiff requested to leave the hostile work environment and felt she had no alternative other than to leave in order to remove herself from Ms. Normand's continued bullying, verbal assault, and racial harassment.

17.

On that same date, shortly after leaving the worksite, Plaintiff was contacted via text message by Geisha Hochbach, Ms. Normand's supervisor, and was told that ARR's Chief Executive Officer, Roy Viger, would be contacting Plaintiff with regard to a plan moving forward with Plaintiff's employment with ARR. A meeting was scheduled to take place on November 17, 2016 with Ms. Hochbach and Ms. Normand.

### *Plaintiff's Complaints and the Resulting Termination of her Employment*

18.

On November 17, 2016, Plaintiff met with Ms. Normand and Ms. Hochbach, wherein Ms. Normand continued to harass Plaintiff, stating "[t]he issue I'm always having with [Plaintiff] is that she don't know her place. You need to know your place, girl" relating to Ms. Normand's demands that Plaintiff shred the positive test results. Ms. Hochbach did not correct or chastise Ms. Normand for her abusive conduct. Plaintiff felt threatened and harassed, and exited again in tears.

19.

On November 21, 2016, Plaintiff met with ARR Human Resources representative Matthew Engler and he spoke to Mr. Viger regarding her concerns related to the shredding of documents and the racial harassment to which she had been subjected. Plaintiff provided Mr. Engler with a document containing several points addressing her concerns with Ms. Normand including the racial harassment to which she had been subjected and the demands of Ms. Normand to shred positive test results. Mr. Engler stated he would discuss the issues addressed with Mr. Viger and get back to the Plaintiff. Plaintiff stated she needed to return to work at ARR as soon as possible because her work was accumulating in her absence.

20.

On November 23, 2016, only two days after Plaintiff dared to voice her grievances regarding the harassment to which she had been repeatedly subjected to at the hands of Ms. Normand and her demands to destroy the positive test results records, on November 23, 2016, an advertisement was posted for Plaintiff's position with ARR, although Plaintiff did not learn of this until November 30, 2016.

21.

On November 28, 2016, Plaintiff was finally permitted to meet with Mr. Viger in person to address her previous concerns relating to both the racial harassment to which she was being subjected and the destruction of the records relating to positive test results, at which time Mr. Viger acknowledged being previously made aware of Plaintiff's concerns regarding Ms. Normand's continuing pervasive racial harassment, as far back as January, 2016. Mr. Viger apologized for not being present and for not finding a solution to Plaintiff's problems with Ms. Normand. Mr. Viger

stated he would follow up with Plaintiff the next day on whether or not they would be moving forward with Plaintiff's employment. This comment surprised Plaintiff and caused her distress.

22.

On November 30, 2016, Plaintiff spoke with Mr. Viger at which time Mr. Viger told Plaintiff that he had made the decision that Plaintiff would remain with the company. However, on this the same date, Plaintiff learned that her position had been posted.

23.

On December 7, 2016, Mr. Viger sent Plaintiff a text message apologizing for not telephoning her earlier, stating that he was out sick and would call her later in the day. He never called.

24.

On December 12, 2016, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). A copy of the December 12, 2016, EEOC Charge of Discrimination, with attachments is attached hereto and made a part hereof as Exhibit "A".

25.

On December 15, 2016, Plaintiff was informed by a former coworker that her position had been filled. On the same date, Plaintiff filed and Amended Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). A copy of the December 15, 2016, EEOC Amended Charge of Discrimination, with attachments is attached hereto and made a part hereof as Exhibit "B".

26.

The EEOC issued a Notice of The Right to Sue on November 2, 2017 in which it stated that it had found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge, a copy of which is attached hereto and made a part hereof by reference as Exhibit "C".

27.

Plaintiff believes and therefore alleges that Defendant's decision to discharge her was in retaliation for her refusal and subsequent reporting of Ms. Normand's demand that she shred positive result in contravention of state law and ARR's own policies and procedures and/or in retaliation for her reporting Ms. Normand's unlawful ongoing racial harassment of Plaintiff.

*Damages*

28.

As a result of the actions set forth in this Complaint, Plaintiff has suffered extensive damages for which she is entitled to backpay, front pay, lost benefits, compensation for emotional distress, humiliation and anxiety, liquidated/punitive damages, and attorney's fees, and such other legal and equitable relief to which she may be entitled.

**Count I**
**Intentional Discrimination:**
**Title VII of the Civil Rights Act of 1964**
**42 USC § 2000(e), et seq.**

29.

Plaintiff reasserts each of the allegations set forth in Paragraphs 1-28.

30.

Plaintiff believes and therefore alleges that her work environment at ARR was permeated with racial hostility, and that even after her multiple complaints, Defendant failed to take appropriate remedial action to remedy same. This constitutes intentional discrimination on the basis of race.

31.

In January, 2016, Plaintiff gave notice to Chief Executive Officer of ARR, Roy Viger, of the unrelenting racial harassment to which she was being subjected to by Ms. Normand and no remedial action was taken.

32.

In March, 2016, Plaintiff again complained to Mr. Viger of Ms. Normand's pervasive racial harassment and expressed her deep concern with several incidents of racial harassment to which she was subjected at the hands of Ms. Normand and, again, no remedial action was taken.

33.

Defendant, who knew of the racially hostile work environment created by Sharon Normand and who failed to take appropriate remedial action to remedy same, is liable to Plaintiff pursuant to Title VII of the Civil Rights Act of 1964, 42 USC § 2000(e), et seq., for all damages Plaintiff sustained, as set forth in Paragraph 28, hereinabove.

## Count II
### Discrimination for Opposition to Unlawful Employment Practice:
### Title VII of the Civil Rights Act of 1964
### 42 USC § 2000(e)-3

34.

Plaintiff reasserts each of the allegations set forth in Paragraphs 1-28.

35.

Plaintiff believes and therefore alleges that Defendant terminated Plaintiff from her employment in whole or in part in retaliation for Plaintiff's complaints regarding the racially hostile work environment to which she was subjected by her supervisor.

36.

Defendant is liable to Plaintiff for its retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 USC § 2000(e)-(3), for all damages Plaintiff sustained, as set forth in Paragraph 28, hereinabove.

### Count III
### Violation of Louisiana Whistleblower Statute
### LSA-R.S. 23:967

37.

Plaintiff reasserts each of the allegations set forth in Paragraphs 1-28.

38.

LSA-R. S. 23:967, often referred to as the "Louisiana Whistleblower Statute", prohibits employers from taking reprisal actions against employees, who in good faith, and after advising their employers of actions that violate Louisiana law, object to or refuse to participate in the illegal actions.

39.

As already alleged, Plaintiff vehemently objected to, opposed and refused to participate in Ms. Normand's intentional and knowing destruction of positive test results on November 15, 2016.

40.

Ms. Normand's intentional and knowing destruction of positive drug test results prior to review by a physician relating to clients who were undergoing court ordered drug testing as a

condition of their probation for criminal behavior violates Louisiana law, a fact of which ARR representatives Sharon Normand, Megan Riley, Matthew Engler, and Roy Viger, were acutely aware due to the fact that Plaintiff brought the matter to their attention.

41.

Ms. Normand's intentional and knowing destruction of positive drug test results violates, at a minimum, the following Louisiana laws:

### A. Obstruction of justice (LSA-R.S. 14:130.1)

Ms. Normand's intentional and knowing destruction of positive drug test results for individuals that were under court ordered drug testing constituted an obstruction of justice in that Ms. Normand had knowledge that the act of destroying the positive test results would affect an actual criminal proceeding and was a tampering of evidence with the specific intent of distorting the results of a criminal proceeding which may prove relevant in that proceeding.

### B. Hospital Records and Retention Act (LSA-R. S. 40:2144)

Ms. Normand's intentional and knowing destruction of positive drug test results was a violation of the Hospital Records and Retention Act in that a Defendant is a "Health care provider" as defined therein and thereby required to maintain its records including, but not limited to, drug test results for a minimum of 10 years from the date of discharge or in this case, from the date the subject of the drug testing is no longer undergoing such testing.

### C. Fraud (La. Civil Code Art. 1953)

Ms. Normand's intentional and knowing destruction of positive drug test results was an act of fraud in that it was a suppression of the truth made with Ms. Normand's intention to economically benefit the Defendant in that it allowed the test subjects to remain a paying

client of the Defendant and was therefore a fraud on both the court that ordered the drug testing and the subject of the testing who was denied the treatment they required.

42.

As referenced in Paragraphs 15 and 16 hereinabove, following Plaintiff's refusal to follow the illegal directive of Ms. Normand, Plaintiff was subjected to harassment and abuse at the hands of Ms. Normand which resulted in her having to leave Defendant's premises on November 15, 2016.

43.

Plaintiff believes and therefore alleges that Defendant terminated Plaintiff from her employment in whole or in part in retaliation for Plaintiff's complaints regarding the illegal directive of Ms. Normand to shred positive drug test results.

44.

Additionally and/or alternatively, Plaintiff submits that each of the decisions and acts including, but not limited to, those described in Paragraphs 17 through 27 hereinabove, and such other decisions, acts and omissions adverse to Plaintiff that may become apparent during the course of discovery, constituted intentional retaliation against her, and violated LSA-R.S. 23:967, which prohibits employers from taking reprisals against employees who in good faith discloses or threatens to disclose a workplace act or practice that is in violation of Louisiana state law.

45.

Additionally and/or alternatively, in addition to her refusal to participate in the illegal shredding of documents and her opposition thereto, Plaintiff opposed the unlawful discrimination against her on the basis of race by creating a pervasively hostile work environment to which she was subjected to at the hands of Ms. Normand, and as a result of her opposition, Defendant

14

retaliated against her and ultimately terminated her employment in addition to the continuous harassment to which she was subjected.

46.

As a result of Defendant's violations of LSA-R. S. 23:967, as set forth hereinabove, Plaintiff incurred the damages set forth in Paragraph 28, for which Defendant is liable.

## Count IV
### Intentional Discrimination under Louisiana Law
### LSA-R.S. 23:332, et seq.

47.

Plaintiff reasserts each of her allegations set forth in Paragraphs 1-25.

48.

Additionally and/or alternatively, Defendant is liable to Plaintiff for intentional discrimination against her on the basis of race pursuant to LSA R.S. 23:332, et seq., by creating a racially hostile work environment and failing to remedy same, and for all damages that Plaintiff has sustained as a result thereof, as set forth in Paragraph 28, hereinabove.

## Count V
### Breach of Employment Contract
### La. C.C. Art. 1998

49.

Plaintiff reasserts each of her allegations set forth in Paragraphs 1-25.

50.

Additionally and/or alternatively, Defendant is liable to Plaintiff for its breach of contract of the terms of Plaintiff's employment with Defendant and, more specifically, Defendant's intentional interference with its own Maternity Leave policy as outlined in Paragraphs 9 through 14, hereinabove and liable to Plaintiff for her nonpecuniary loss pursuant to La. C.C. Art. 1998,

and for all damages that Plaintiff has sustained as a result thereof, as set forth in Paragraph 28, hereinabove.

## Count VI
## Constructive Discharge

51.

Solely in the alternative and out of an abundance of caution, as Plaintiff believes and has no doubt that she was terminated from her employment with the Defendant, due to the fact that Defendant alleged as a defense to Plaintiff's claim EEOC that Plaintiff "walked off the job", Plaintiff alleges constructive-discharge as it relates to her employment with Defendant and, specifically, when Plaintiff left Defendant's worksite on November 15, 2016, because her working conditions had become so intolerable due to the racial harassment to which she was subjected that a reasonable person in Plaintiff's position would have felt compelled to resign in the face of such circumstances.

## Trial by Jury

52.

Plaintiff is entitled to and requests a trial by jury.

**WHEREFORE**, premises considered, Plaintiff, Demetrius D. Brailey, prays that this matter be set for trial by jury, and that after due proceedings, there be judgment herein in her favor and against Defendant, Addiction Recovery Resources, Inc., awarding Plaintiff all damages that she has sustained, including back pay, front pay, lost benefits, compensation for emotional distress, humiliation and anxiety, compensation for her monetary losses, liquidated/punitive damages, attorney fees, interest on all sums due, costs, and all such other legal and equitable relief to which she may be entitled.

Respectfully submitted,

*[signature]*

Lisa Brener, La. Bar #01809, T. A.
Douglas R. Kraus, La. Bar. #26668
**Brener Law Firm, LLC**
3640 Magazine Street
New Orleans, LA 70115
Tel. (504) 302-7802
Fax (504) 304-4759
lbrener@brenerlawfirm.com
dkraus@brenerlawfirm.com
*Attorneys for Plaintiff, Demetrius D. Bailey*